1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JACK LEE BREINER                          No.  2:21-cv-1053 DAD DB

12                    Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   M. POLLARD,

15                    Respondent.

16

17        Petitioner Jack Lee Breiner, a state prisoner, proceeds pro se with a petition for a writ of

18   habeas corpus under 28 U.S.C. § 2254. Petitioner challenges his conviction entered on March 10,

19   2019 in the Modoc County Superior Court. A jury found petitioner guilty of premeditated murder

20   of a peace officer engaged in the performance of his duties by means of discharging a firearm

21   from a motor vehicle, attempted murder, and possession of a firearm by a prohibited person,

22   finding true the multiple firearm allegations. In his habeas petition, petitioner raises the following

23   claims: (1) procedural due process violation for failure to hold a competency hearing; (2) jury

24   instructional error regarding imperfect self-defense; (3) jury instructional error for failing to

25   define "delusion" in the imperfect self-defense instruction; and (4) cumulative error. For the

26   reasons discussed below, this Court recommends denying the petition for habeas relief.

27   ////

28   ////

1

1

**BACKGROUND**

2

**I.   Facts Established at Trial**

3

On direct appeal, the California Court of Appeal for the Third Appellate District provided

4

the following summary of the facts presented at trial:

5

**FACTUAL AND PROCEDURAL BACKGROUND**

6

**A**

7

*Defendant's Background*

8

Defendant, according to his father, was always "a little off the
rocker" and "not quite right in the head." His mother always had
concerns about defendant's mental health because of a severe head
injury he sustained when he was four years old that resulted in a
month of hospitalization. As a child, defendant's speech was delayed
and he took special education classes; however, defendant ultimately
became an average student. Defendant began heavily drinking at the
age of 14 and continued for decades. In 1989, when defendant was
in his early 20's, he, his parents, and his two brothers moved to
Modoc County. Defendant's mother noticed defendant's mental
health started to decline around this time.

After moving to Modoc County and over the course of nearly three
decades, defendant was arrested several times for low-level and
alcohol-related offenses by the Modoc County Sheriff's Department.
Because of these frequent arrests, defendant spent time in the Modoc
County Jail. He claimed that, while incarcerated there, he was
assaulted numerous times by Modoc County Sheriff's deputies and
inmates at the deputies' direction or through their complicity.
Defendant's family testified that defendant was often released from
Modoc County Jail injured or would complain about physical and
sexual assaults having occurred while incarcerated there. The deputy
defendant most often complained of was Modoc County Sheriff's
deputy Dan Nessling.

Deputy Nessling previously oversaw the Modoc County Jail and was
indicted by a grand jury for misdemeanor excessive force and had
been the subject of numerous complaints and legal settlements
regarding excessive force. "It [wa]s ... stipulated that Deputy
Nessling has screamed at, physically assaulted, battered, injured and
terrified numerous arrestees, inmates and citizens without suffering
any adverse disciplinary consequences from [Modoc County] Sheriff
Mike Poindexter or prior sheriffs Bruce Mix or Mark Gentry." While
Deputy Nessling no longer worked at the Modoc County Jail as a
sergeant at the time of defendant's trial, he was still a deputy working
patrol.

In August 2012, while defendant was incarcerated in the Modoc
County Jail, he was severely injured when he was assaulted by
another inmate who punched him in the face. The single punch
resulted in an orbital blowout fracture, a detached retina, and

a ruptured globe. While defendant was given immediate emergency treatment by the Modoc County Jail staff, the staff did not transfer defendant to a hospital for treatment for four days. A scan of defendant's brain performed around this time showed defendant had no brain defects.

After defendant was released from the Modoc County Jail in 2014, he lived in the bunkhouse on his parents' ranch. Over the course of the next two years, defendant started acting differently; he was reclusive and rarely left the house. He talked incessantly about various conspiracy theories supported by the radio program InfoWars and its host Alex Jones. This included the belief the government was medicating people with chemicals released by airplanes that flew overhead and that the Russian and Chinese governments were actively planning an invasion of the west coast. Defendant also believed aliens were watching him and were "gonna get us all." Defendant expressed fear in law enforcement and going to jail, specifically the Modoc County Jail where he thought he would be killed. He told his father and younger brother he would kill any deputy who attempted to arrest him. Defendant was increasingly paranoid that he was being followed or that the world was ending.

In the six months leading to October 19, 2016, defendant became increasingly agitated and prone to paranoid outbursts. He talked about foreign invasions and domestic government authorities coming to get him. He said he saw the devil and horsemen of the apocalypse. Defendant's mother called Sheriff Poindexter to ask for help with defendant and shared that defendant had threatened to kill her and the family. Defendant's mother was told the Modoc County Sheriff's Department could not do anything to help her until defendant became violent.

In the days before October 19, 2016, defendant became even worse. He said an ankle monitor he was required to wear was put on him by the Chinese and Russian governments. He also accused his family of being part of a Russian conspiracy to monitor him and threatened to kill them. Defendant's mother sought help from Modoc County Behavioral Health. She and defendant's older brother also complained to defendant's parole officer about his behavior but were told there was nothing the parole officer could do to help them.

**B**

***The Shooting***

On the morning of October 19, 2016, defendant's father and older brother went to defendant's bunkhouse to collect empty water jugs to fill with filtered water for the family's use. When they got to the bunkhouse, they saw defendant had filled the water jugs with well water. Defendant said he had filled the jugs in order to prepare for an attack or for the end of the world. Defendant's father began emptying the water jugs when defendant entered and threw a "tantrum." Defendant hit his father and his father fell to the ground, where defendant then got on top of him. Defendant's older brother grabbed defendant and threw him against the wall before threatening to call

3

911. Defendant's older brother then walked out of the bunkhouse to make the call.

Modoc County Sheriff's deputy Julie Winkle took defendant's older brother's 911 call at 9:30 a.m. He told her he needed a deputy to come to the ranch because defendant was pushing his father around. Modoc County Sheriff's deputy Jack Hopkins overheard the call and responded. Several minutes after Deputy Hopkins responded to the call, Sheriff Poindexter followed him in his own patrol vehicle. Sheriff Poindexter attempted to get in contact with Deputy Hopkins to tell him they should handle the call together, but was unable to reach him.

After making the 911 call, defendant's older brother walked over to his parents' house. When he looked back toward the bunkhouse, he saw defendant walking out with a rifle. As defendant walked, he yelled to his older brother that the older brother had just "caused [defendant's] death." Defendant pointed the gun at his older brother, causing his older brother to run to the back of the house. Defendant then got in his truck and drove slowly around the house and the bunkhouse before slowly driving down the long road leaving the ranch. During this time, defendant's older brother called 911 again to inform the dispatcher defendant was armed with a rifle. At 9:38 a.m., the dispatcher told Deputy Hopkins defendant was armed and Deputy Hopkins asked whether defendant's direction of travel was known, which it was not.

When defendant was about 500 feet from the house, Deputy Hopkins approached him in his patrol vehicle from the opposite direction. Defendant fired at Deputy Hopkins with his rifle from his truck. The bullet traveled through the windshield of Deputy Hopkins patrol vehicle and struck Deputy Hopkins's "right forehead and right eye nearly obliterating his right forehead and right eye and inflicting a lethal brain injury." Defendant got out of his truck and walked over to Deputy Hopkins's patrol vehicle and turned it off. He then got back in his truck, cut off his ankle monitor, and drove away until his truck got stuck in the mud further down the road.

At approximately 9:52 a.m., defendant saw Sheriff Poindexter approaching the ranch on a side road. Defendant got out of his truck and shot at Sheriff Poindexter's patrol vehicle. Sheriff Poindexter stopped his vehicle and radioed for help. Sheriff Poindexter was approximately 50 to 60 yards away. Defendant shot at Sheriff Poindexter two to three more times. At least one of those shots struck the patrol vehicle. Sheriff Poindexter continued to drive an additional 100 yards away from defendant, where he safely retrieved his department-issued rifle to return fire.

When Sheriff Poindexter returned fire, he hit defendant in the knees and defendant stopped shooting at him. Deputies then arrived at Sheriff Poindexter's location and defendant was taken into custody without incident and given medical attention. Upon a search of defendant's truck, deputies discovered a change of clothes, boxes of bullets, a knife, a sleeping bag, cans of food, toilet paper, first aid items, a saw, a toothbrush, and a water jug. Defendant's medications

4

were also found in the truck.

**C**

*Defendant's Statements*

On the way to the hospital defendant said he "was tired of them fucking with [him]. That's why [he] shot [Deputy Hopkins]." At the hospital, defendant was in a lot of pain and made several statements that his hands hurt even though he had no injury to his hands. Defendant also told his nurse with tears in his eyes that he "didn't mean to shoot [Deputy Hopkins]. It was an accident." Defendant further told a deputy guarding him that the deputy should "[j]ust take me to Modoc so I can plead guilty and go to jail." Defendant also told the deputy, "I am such a dumb ass. I should have stayed where I was and shot both their asses."

Several days after the shooting, defendant spoke with Butte County Sheriff's sergeant Matt Calkins. During that interview, defendant said he was scared when he saw Deputy Hopkins approaching him and thought he was going to be arrested. He shot at Deputy Hopkins from inside his truck to scare the deputy away. When he shot at Deputy Hopkins, defendant knew it was a bad idea and the wrong thing to do. Defendant at times contradicted himself or made scattered or irrelevant statements. For example, when asked why deputies were called to the ranch, defendant said it was to check on the cattle or the Islamic "foreigners" that "just fucking show up. And they were just fucking out there, they sleep in the shop or something." Defendant also said he could not remember shooting at Deputy Hopkins and that he blacked out. He further claimed Sheriff Poindexter shot at him first and defendant shot back to scare the sheriff away.

A few days after that interview, defendant was interviewed again. He repeatedly told Sergeant Calkin that he would prefer to speak about the matter somewhere else and was uncomfortable. During that interview he claimed the United Nations raped his wife "a long time ago." Defendant's thoughts were scattered and he appeared at times unable to focus on the questions asked of him.

**D**

*Defendant's Mental Health*

Dr. Melissa Piasecki, a forensic psychiatrist, examined defendant. As part of her exam, she reviewed defendant's medical records from the Modoc Mental Health Center. Those records revealed defendant was diagnosed with schizoaffective disorder in 2014. Schizoaffective disorder is a blend of schizophrenia, which is a psychotic disorder, and a mood symptom, in this case both irritability and depression. The records further showed defendant had a nearly three-decade history of anxiety and depression. Following defendant's diagnosis, he was prescribed antipsychotic drugs to target his psychotic symptoms like delusions and possibly hallucinations. Defendant also received medications to help with his anxiety, as well as

antidepressants.

A psychotic disorder, like schizophrenia, is marked by a break with reality. These breaks with reality take two forms -- delusions, which are fixed false beliefs, and hallucinations, which are false sensory perceptions. Defendant's medical records and statements from his family indicated defendant's delusions escalated in intensity in 2016 and he responded with increased amounts of agitation. It also appears he began hallucinating around this time. Hallucinations present a more pervasive problem than delusions and show a worsening of symptoms. Based on her exam, Dr. Piasecki believed defendant suffered from schizoaffective disorder or some form of schizophrenia.

After Dr. Piasecki examined defendant and formed this opinion, she received defendant's brain scan and reevaluated her diagnosis. The scan showed defendant had suffered a small stroke in the left temporal region of his brain, cutting off blood flow to that area. A stroke in that area of the brain would not affect a person's motor behavior, instead it would affect a person's memory and is associated with psychosis and other psychiatric problems. Based on Dr. Piasecki's review of all the records, she believed defendant had a psychotic disorder made worse by his medical condition, i.e., the stroke that cut off blood flow to his temporal lobe. Based on this diagnosis, Dr. Piasecki was of the opinion that when defendant acted on October 19, 2016, he made decisions based on facts that appeared true to him.

(ECF No. 20-1 at 2–8); People v. Breiner, No. C089247, 2020 WL 6018522, at *1–4 (Cal. Ct. App. Oct. 9, 2020).

## II.   Procedural Background

### A.   Judgment

A jury convicted petitioner of premeditated murder of a peace officer engaged in the performance of his duties by means of discharging a firearm from a motor vehicle, attempted murder, and possession of a firearm by a prohibited person, finding true the multiple firearm allegations. (ECF No. 20-16 at 240–44.) The jury also found petitioner to be sane when he committed these offenses. (ECF No. at 20-18 at 51–52.) The jury sentenced petitioner to life without parole. (ECF No. 20-19 at 27–28.)

## III.   State Appeal, State Habeas, and Federal Proceedings

Petitioner timely appealed his convictions, raising claims of procedural due process violation, jury instructional error regarding imperfect self-defense, and cumulative error. The state appellate court affirmed the judgment. (ECF No. 20-1.) He subsequently filed a petition for

6

rehearing, which the state appellate court denied. (ECF No. 20-6.)  Petitioner sought review in the California Supreme Court, and the court summarily denied review. (ECF No. 20-8.)  Petitioner did not file state habeas petitions.

Petitioner filed the present petition in April 2021. (ECF Nos. 1 & 6.) Respondent filed an answer. (ECF Nos. 19 & 20.) Petitioner did not file a traverse.

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

A court can entertain an application for a writ of habeas corpus by a person in custody under a judgment of a state court on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for an alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing alone is not cognizable in federal court on habeas.").

This court may not grant habeas corpus relief unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to

1  "determine whether a particular rule of law is so widely accepted among the Federal Circuits that
2  it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

3       A habeas corpus application can invoke § 2254(d)(1) in two ways. First, a state court
4  decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a
5  holding of the Supreme Court or reaches a different result from Supreme Court precedent on
6  "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting
7  Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal
8  habeas court may grant the writ if the state court identifies the correct governing legal principle
9  from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the
10 prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at
11 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not
12 issue the writ simply because that court concludes in its independent judgment that the relevant
13 state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that
14 application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v.
15 Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination
16 that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could
17 disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86,
18 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a
19 condition for obtaining habeas corpus from a federal court, a state prisoner must show that the
20 state court's ruling on the claim being presented in federal court was so lacking in justification
21 that there was an error well understood and comprehended in existing law beyond any possibility
22 for fairminded disagreement." Richter, 562 U.S. at 786–87.

23      A petitioner may also challenge a state court's decision as being an unreasonable
24 determination of facts under § 2254(d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir.
25 2012). Challenges under this clause fall into two categories; first, the state court's findings of fact
26 "were not supported by substantial evidence in the state court record," or second, the "fact-
27 finding process itself" was "deficient in some material way." Id.; see also Hurles v. Ryan, 752
28 F.3d 768, 790–91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity

for the petitioner to present evidence, the fact-finding process may be deficient, and the state court opinion may not be entitled to deference). Under the "substantial evidence" category, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012) (quoting Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999–1001 (9th Cir. 2014)). The "fact-finding process" category, however, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present new evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

This court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim

9

has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome if "there is reason to think some other explanation for the state court's decision is more likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court's decision rejects some of petitioner's claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d at 860.

**ANALYSIS**

Petitioner asserts four grounds for relief: (1) the trial court erred in failing to hold a competency hearing; (2) jury instructional error regarding imperfect self-defense; (3) jury instructional error regarding failure to define delusion in the imperfect self-defense instruction; and (4) cumulative error.

**I.     Claim One: Failure to Hold a Competency Hearing**

Petitioner claims that the trial court erred in failing to hold a competency hearing after his attorney expressed doubt as to his competency and the trial judge appointed mental health experts to evaluate petitioner. (ECF No. 1.) Respondent argues that a fairminded jurist could conclude that the state court's rejection of petitioner's procedural due process claim was reasonable. (ECF No. 19 at 14–24.)

**A. State Court Opinion**

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the California Court of Appeal considered and rejected the claim:

////

////

////

## I

### *The Trial Court Did Not Err By Failing To Hold A Competency Hearing*

Defendant contends the trial court erred by failing to hold a competency hearing after his counsel declared a doubt as to defendant's competency and the trial court suspended proceedings and appointed two experts to evaluate defendant. The People counter that the trial court effectively fulfilled its obligation to hold a hearing and defense counsel impliedly submitted on the experts' evaluations. We do not agree with either party.

A trial court has a nondiscretionary obligation to suspend proceedings and hold a competency trial only when the trial court has declared a doubt as to a defendant's competency or defense counsel has supported his or her declaration of a doubt with substantial evidence. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465.) "Otherwise, we give great deference to the trial court's decision not to hold a competency trial." (*Ibid.*) Here, the trial court did not declare a doubt as to defendant's competence or find substantial evidence supported defense counsel's declaration. Thus, the trial court did not err by failing to hold a competency hearing.

### A

### *Background*

On January 8, 2018, defense counsel filed an affidavit and motion to suspend proceedings until determination of defendant's mental competence. Defense counsel believed defendant to be incompetent to stand trial because he observed defendant "to be delusional and experienc[ing] substantial memory deficits" during his visits. Defendant "is incapable of recalling the names, locations, and time frames for schools he has attended, doctors who treated him, hospitals where he was treated, me[n]tal health facilities where he was treated, and substance abuse programs he has attended." A month before, defendant "refused an interview with a psychiatrist retained by the defense." Based on conversations with defendant's family, defense counsel believed defendant had a "history of head trauma, substance abuse, and mental illness and that [he] has been treated for a mental condition at one or more mental health facilities."

On January 25, 2018, the trial court suspended proceedings pursuant to Penal Code[1] section 1368 and ordered defendant be evaluated. In doing so, it stated it had "received and reviewed an affidavit by [defense counsel]. The affidavit is, of course, under oath and [counsel] has indicated to the Court that he is declaring a doubt pursuant to 1368 as to [defendant]. And the Court has reviewed and considered that and the Court's tentative, of course, would be to suspend proceedings based on [defense counsel's] observations, [and] statements that are contained in his affidavit." After hearing no objections from the parties, the trial court stated it would "suspend proceedings pursuant to 1368 and the Court will appoint the required experts in this matter."

11

[N.1 Further section references are to the Penal Code, unless otherwise indicated.]

Two experts subsequently evaluated defendant and filed reports concluding defendant "was competent to assist counsel and understands the proceedings in this matter."

At a hearing on April 16, 2018, the trial court indicated it did not find substantial evidence of defendant's incompetence and was not going to hold a competency hearing. Defense counsel indicated he was not prepared to submit on the reports because an evaluation by "our doctor" revealed additional information. "[S]o at this point, defense is not prepared to stipulate or submit on the reports with regard to competency. I think it would behoove us to set a trial. We may get additional information from that doctor that would change that position, but I think it would be imprudent to go ahead and submit on those reports at this state."

The trial court denied defense counsel's request to set a hearing. It reasoned the standard to set a hearing was substantial evidence of defendant's incompetence. The trial court based its finding of no substantial evidence of defendant's incompetence on the fact defense counsel's declaration was not supported by the two psychological evaluations, both of which contained conclusions defendant was competent. "[S]o without substantial evidence, I wouldn't be setting it for hearing on the issue of competence, so I don't know why you haven't filed anything at this juncture if you felt that there was something sufficient to sway the Court."

The parties then moved on to determining a trial date for the underlying charges. As part of that discussion, defense counsel said, "[w]e were talking about setting the trial in August. If I had received [the doctor's] report ... which I had not received, then there may be substantial evidence to have a trial on competency, but what I'd rather do, Judge, so we can have the schedule and keep moving forward, is if we go ahead and submit on the 1368 reports right now instead of having to re-raise competency, if I get that [doctor's] report, I think it's more efficient to reserve the competency issue for a future date and that way we can keep a trial date, we can set a motion date." The trial court responded, "[w]e can keep a trial date. At this point, the Court's making the finding that there is not substantial evidence of incompetency to set a hearing and then it would require that the defense file something in the future if [it] want[s] to, so proceedings are restored."

## B

### *The Trial Court Did Not Declare A Doubt Or Find Substantial Evidence Of Defendant's Incompetence, Thus It Was Not Required To Hold A Competency Hearing*

"The due process clause of the federal Constitution's Fourteenth Amendment prohibits trying a criminal defendant who is mentally incompetent." (*People v. Ary* (2011) 51 Cal.4th 510, 517.) "When a trial court is presented with evidence that raises a reasonable doubt

12

about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally competent may the matter proceed to trial. [Citation.] [¶] California law reflects those constitutional requirements." (*Ibid.*) Accordingly, " ' "state law require[s] a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." ' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 464.)

In California, this law is codified in section 1368. Subdivision (a) of that section provides: "If, during the pendency of an action and prior to judgment ... a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent.... At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

Subdivision (b) of section 1368 then provides: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in superior court." "[W]hen an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." (§ 1368, subd. (c).)

Defendant argues subdivisions (a) and (b) of section 1368 are "alternative procedural mechanisms by which a reasonable doubt may arise as to a defendant's trial competence." Thus, according to defendant, if either his counsel or the trial court declares a doubt, then criminal proceedings cannot be reinstated absent a hearing pursuant to section 1369 to determine a defendant's competence. We disagree with defendant's interpretation of section 1368.

Section 1368, subdivisions (a) and (b) are not alternative procedural mechanisms by which to achieve a competency hearing under section 1369. Section 1368, subdivision (a) lays out the obligations of a trial judge in the event a doubt regarding defendant's competency arises in the judge's mind. Part of that obligation is to inquire of defense counsel's opinion on the matter. Section 1368, subdivision (b) provides the procedure for the court to use depending on counsel's opinion. Together, subdivisions (a) and (b) of section 1368 provide the procedure when the trial court entertains a doubt

13

regarding a defendant's competence. While defense counsel can alert the trial court to the issue of defendant's competence, the court is not required to entertain a doubt unless counsel's opinion is supported by substantial evidence. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.)

Case law supports this interpretation. In *Sattiewhite*, our Supreme Court reviewed the principles applicable to determining whether a competency hearing is required. Our Supreme Court observed " '[c]ounsel's assertion of a belief in a client's incompetence is entitled to some weight," ' it " 'does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing.' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) Rather, "defense counsel must present expert opinion from a qualified and informed mental health expert, stating under oath and with particularity that the defendant is incompetent, or counsel must make some other substantial showing of incompetence that supplements and supports counsel's own opinion. Only then does the trial court have a nondiscretionary obligation to suspend proceedings and hold a competency trial. [Citation.] Otherwise, we give great deference to the trial court's decision not to hold a competency trial." (*Ibid*.)

Similarly in *Ary*, our Supreme Court stated that "[s]ection 1368, in subdivision (a), requires a trial court to suspend criminal proceedings at any time 'prior to judgment' if the court reasonably doubts 'the mental competence of the defendant.' A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own." (*People v. Ary*, *supra*, 51 Cal.4th at p. 517; *People v. Lewis* (2008) 43 Cal.4th 415, 524, rejected on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919.)[2]

[N.2 Both *Ary* and *Sattiewhite* interpreted a prior version of section 1368. (See Stats. 1998, ch. 932, § 40.) The statute's subsequent amendment did not change section 1368 in any relevant regard. (See § 1368.)]

With this understanding of the relevant statutory and case law, subdivision (b) of section 1368 cannot be read as an alternative procedural mechanism to subdivision (a). Instead, the two must be read together and stand for the proposition that once the trial court has declared a doubt or defendant's counsel has presented substantial evidence of defendant's incompetence to justify a doubt in the trial court's mind, defendant is entitled to a competency hearing pursuant to section 1369.

Defendant argues the trial court effectively declared a doubt or found substantial evidence supported counsel's declaration when it suspended criminal proceedings under section 1368 and ordered defendant be evaluated by two experts, both required components of a competency hearing under section 1369. Because these preliminary findings were made, defendant argues, the court was required to complete the competency hearing process. We disagree with defendant's underlying premise that the trial court declared a doubt

14

1    or found substantial evidence supporting counsel's declaration.

2
3    Notably, the trial court never said it declared a doubt or found
     substantial evidence supported counsel's declaration that defendant
     was incompetent. It also did not mention its own observations of
4    defendant or whether it agreed or disagreed with defense counsel's
     assessment. Nor did the trial court order a competency hearing, as it
5    was required to do if it believed there was a doubt as to defendant's
     competence. The record indicates defense counsel communicated his
6    doubt regarding defendant's competence to the court, and the court
     believed it was required to suspend criminal proceedings and appoint
7    experts based on that communication. This was a mistake. (See §§
     1368, 1369.) This misconception, however, did not trigger the
8    court's obligation to hold a competency hearing, contrary to
     defendant's contention. Defendant does not argue the court lacked
9    discretion to suspend criminal proceedings or appoint experts absent
     the court's belief or substantial evidence of defendant's
10   incompetence. While section 1368 entitles a defendant to these
     procedures if the court believes the defendant incompetent or finds
11   substantial evidence supports counsel's declaration, nothing in the
     section precludes the court from following these procedures before
12   determining for itself whether there is a doubt as to a defendant's
     competence. That appears to be what happened here. Indeed, at the
13   subsequent hearing on defendant's competence, the trial court was
     prepared to address whether substantial evidence of defendant's
     incompetence had been discovered.
14

15   Moreover, the trial court's appointment of experts does not signal it
     entertained a doubt as to defendant's competence or believed
16   substantial evidence supported defense counsel's declaration. As our
     Supreme Court indicated, experts are often the tool to achieving the
17   standard entitling a defendant to a hearing. (*People v.
     Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) And while the trial court
18   suspended criminal proceedings, it is not the suspension of criminal
     proceedings that entitles a defendant to a competency hearing. It is
19   the trial court's doubt or substantial evidence supporting counsel's
     declaration and "[o]nly then does the trial court have a
20   nondiscretionary obligation to suspend proceedings and hold a
     competency trial. [Citation.] Otherwise, we give great deference to
21   the trial court's decision not to hold a competency trial." (*People v.
     Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) Because the trial court did
22   not declare its own doubt or find substantial evidence supported
     defense counsel's doubt, defendant was not entitled to a competency
23   hearing. Accordingly, defendant's procedural due process rights
     were not violated, and the trial court did not err.[3]

24   [N.3 Defendant does not argue his substantive due process rights
     were violated, only his procedural due process rights. Thus, we need
25   not address whether his counsel's declaration provided substantial
     evidence of his incompetence.]
26

27   Breiner, 2020 WL 6018522, at *4–7.

28   ////

15

1

**B. Discussion**

2      It is axiomatic that a criminal defendant cannot stand trial unless he is competent. Godinez

3  v. Moran, 509 U.S. 389, 396 (1993). Competency means that a defendant "'has sufficient present

4  ability to consult with his lawyer with a reasonable degree of rational understanding … [and] a

5  rational as well as a factual understanding of the proceedings against him.'" Dusky v. United

6  States, 362 U.S. 402, 402 (1960) (per curiam); see also Drope v. Missouri, 420 U.S. 162, 171

7  (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the

8  capacity to understand the nature and object of the proceedings against him, to consult with

9  counsel, and to assist in preparing his defense may not be subjected to a trial."); Cf. Medina v.

10  California, 505 U.S. 437, 448–49 (1992). However, the Supreme Court has noted that "[a]s in any

11  criminal case, a competency determination is necessary only when a court has reason to doubt the

12  defendant's competence." Godinez, 509 U.S. at 401 n.13; see also Deere v. Cullen, 718 F.3d

13  1124, 1145 (9th Cir. 2013) (stating that the state court's findings that defendant was competent to

14  plead guilty and stand trial are presumed correct if they are fairly supported by the record, and no

15  formal evidentiary hearing is required for this presumption to be applied).

16      The Supreme Court has not identified the procedures that are constitutionally mandated to

17  preserve a defendant's right to due process. "Consistent with our precedents, it is enough that the

18  State affords the criminal defendant on whose behalf a plea of incompetence is asserted a

19  reasonable opportunity to demonstrate that he is not competent to stand trial." Medina, 505 U.S.

20  451. In Pate v. Robinson, 383 U.S. 375 (1966), the Supreme Court held that uncontradicted

21  evidence of petitioner's insanity entitled him to a competency hearing under Illinois statute, and

22  the trial court's failure to hold that hearing deprived him of his constitutional right to a fair trial.

23  Pate, 383 U.S. at 385. Likewise, in Drope, the Supreme Court determined that Missouri's

24  statutory procedure "is, on its face, constitutionally adequate to protect a defendant's right not to

25  be tried while legally incompetent." Drope, 420 U.S. at 173. It concluded that "when considered

26  together with the information available prior to trial and the testimony of petitioner's wife at trial,

27  the information concerning petitioner's suicide attempt created a sufficient doubt of his

28  competence to stand trial to require further inquiry on the question." Id. at 180. The Ninth Circuit

16

1    has stated that a "state trial judge must conduct a competency hearing, regardless of whether

2    defense counsel requests one, whenever the evidence before the judge raises a *bona fide* doubt

3    about the defendant's competence to stand trial." Williams v. Woodford, 384 F.3d 567, 603 (9th

4    Cir. 2004); see also United States v. Dreyer, 705 F.3d 951, 960 (9th Cir. 2013); Davis v.

5    Woodford, 384 F.3d 628, 646 (9th Cir. 2004) (concluding that trial judge did not err in declining

6    to hold a competency hearing where there was not substantial evidence of incompetence and the

7    judge did not express doubt regarding defendant's competency); West v. Grounds, 708 F. App'x

8    476, 478 (9th Cir. 2018). A bona fide doubt means substantial evidence of incompetency, or

9    substantial evidence that the defendant lacks ability to consult with his lawyer or lacks rational

10   understanding of the proceedings. Williams, 384 F.3d at 604.

11          Here, the state court reasonably concluded that the trial court did not violate petitioner's

12   procedural due process rights when it failed to hold a competency hearing. On January 8, 2018,

13   defense counsel submitted an affidavit and motion to suspend proceedings until determination of

14   defendant's mental competency. (ECF No. 20-9 at 54–57.) The trial court tentatively suspended

15   the proceedings, ordering two mental health evaluations. (ECF No. 20-11 at 153–54; ECF No. 20-

16   9 at 69–70.) Although defense counsel's affidavit questioned defendant's competency, both

17   experts concluded that defendant was competent to stand trial. (ECF No. 20-9 at 78–79, 92–94.)

18   Based on these expert evaluations and defense counsel's failure to present any evidence of

19   incompetence, the trial court found no substantial evidence of incompetency and did not schedule

20   a competency hearing. (ECF No. 20-11 at 163–65.) On appeal, the state court concluded that

21   "[b]ecause the trial court did not declare its own doubt or find substantial evidence supported

22   defense counsel's doubt, defendant was not entitled to a competency hearing." (ECF No. 20-1 at

23   15.) This Court determines that the state court's conclusion was not objectively unreasonable.

24   See generally Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam). Like in United States v.

25   Mikhel, 889 F.3d 1003 (9th Cir. 2018), the uncontradicted psychiatric evaluations respecting

26   petitioner's competency and "the absence of any clinical evidence of incompetence distinguish

27   this case from those in which [the Ninth Circuit] has found reversible error." Mikhel, 889 F.3d at

28   1039.

To the extent petitioner argues that state law required the trial court to hold a competency hearing after ordering two mental health evaluations under California Penal Code section 1368, this argument also fails. This is a matter of state law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67–68. The state court decided that "[w]hile section 1368 entitles a defendant to these procedures if the court believes the defendant incompetent or finds substantial evidence supports counsel's declaration, nothing in the section precludes the court from following these procedures before determining for itself whether there is a doubt as to a defendant's competence. That appears to be what happened here." Breiner, 2020 WL 6018522, at *7. This federal habeas court is bound by the state court's interpretation of state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Horton v. Mayle, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").

The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, or that such a finding was based on an unreasonable application of the facts. This Court recommends denying habeas relief on claim one.

## II.   Claims Two and Three: Instructional Error Regarding Imperfect Self-Defense

Petitioner raises two instructional error claims regarding the imperfect self-defense instruction. First, he argues that the trial court erred by instructing, in conjunction with the prosecutor's argument, that because petitioner was the aggressor against his father, he could not rely on imperfect self-defense. Second, petitioner claims that the trial court erred when it instructed that petitioner could not rely on imperfect self-defense if he was acting under a delusion without defining "delusion." (ECF Nos. 1 & 6.) Respondent argues the state court reasonably rejected both of petitioner's claims. (ECF No. 19 at 24-29.)

### A.   State Court Opinion

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the state appellate court considered and rejected the claim:

////

18

## II

### *There Was No Instructional Error*

Defendant contends the court erred in two respects as it pertains to the imperfect self-defense instruction. First, he argues the court erred by instructing and then permitting the prosecutor to argue that, because defendant was the aggressor against his father, he could not rely on imperfect self-defense. Second, defendant argues the court erred by instructing the jury defendant could not rely on imperfect self-defense if it believed he acted under a delusion, without also defining the meaning of delusion. We disagree.

### A

#### *Background*

Defendant requested the jury be instructed on imperfect self-defense. The court indicated it did not see sufficient provocation to justify the instruction. Defendant agreed in the context of a self-defense theory; however, he argued imperfect self-defense required only a subjective belief of provocation. The prosecution agreed with defendant, but requested a pinpoint instruction informing the jury that a "person who kills or attempts to kill while acting under a delusion cannot avail himself of imperfect self-defense." Defendant conceded this was an accurate statement of the law. The court agreed to give the prosecution's requested pinpoint instruction.

The prosecution later requested an additional pinpoint instruction regarding imperfect self-defense. According to the prosecution's theory, defendant could not rely on imperfect self-defense because he was the aggressor against his father. The theory continues that because Deputy Hopkins and Sheriff Poindexter were responding to defendant's aggression, defendant cannot rely on their response to show provocation under any circumstances. The court agreed to instruct the jury pursuant to this theory and allow the parties to argue the issue to the jury. Defendant did not object.

The jury was instructed on imperfect self-defense as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] ... The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief and the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if: One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury. And two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but three, at least one of those beliefs was an unreasonable belief. Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's belief, consider all the circumstances as they were known and appeared to the defendant. A danger is imminent if, when the fatal wound occurred, the danger actually

existed or the defendant believed it existed. The danger must seem immediate and present so that it must be instantly dealt with. It may not be merely prospective or in the near future.

"Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force. [¶] If you find that [Deputy] Hopkins threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs. If you find that the defendant knew that [Deputy] Hopkins had threatened or harmed others in the past, you may consider [that fact]."

"A person who kills or attempts to kill while acting under a delusion cannot avail himself of imperfect self-defense.... [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If [t]he People have not met this burden, you must find the defendant not guilty of murder."

**B**

***Legal Authority***

" ' "The rules governing a trial court's obligation to give jury instructions without request by either party are well established. 'Even in the absence of a request, a trial court must instruct on general principles of law that are ... necessary to the jury's understanding of the case.' [Citations.] That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation]." [Citation.] "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning." ' [Citation.] 'We consider the challenged instruction in the context of the instructions and record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction." ' (*People v. Garcia* (2020) 46 Cal.App.5th 123, 154-155.) We independently review the correctness and adequacy of the trial court's instructions, examining whether the court " 'fully and fairly instructed on the applicable law.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Although a trial court has a duty to adequately instruct on the law, "it has no duty to give clarifying or amplifying instructions absent a request." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331; see *People v. Sanders* (1995) 11 Cal.4th 475, 533-534.) Failure to request a clarifying or amplifying instruction results in forfeiture of the issue on appeal. (*People v. Richardson* (2008) 43 Cal.4th 959, 1022-1023.) "[D]efendant is not entitled to remain mute at trial and scream foul on appeal for the court's failure to expand, modify, and refine standardized jury instructions." (*People v. Daya* (1994) 29 Cal.App.4th 697, 714.)

////

////

20

1

C

2

***The Court Adequately Instructed On An Aggressor's Ability To
Rely On Imperfect Self-Defense***

3

4

Defendant contends it was error for the court to instruct the jury that
"[i]mperfect self-defense does not apply when the defendant, through
his own wrongful conduct, has created circumstances that justify his

5

adversary's use of force." Specifically, he argues "[t]his grossly
oversimplified   and   misleading   instruction   told   the   jury   that

6

[defendant's] 'wrongful conduct' in assaulting his father deprived
[defendant] of the right to [rely] on imperfect self-defense, no matter

7

what [defendant] had subjectively believed or -- for that matter -- no
matter what amount of hypothetical force Deputy Hopkins might

8

have used against [defendant]." Notably, defendant does not argue
this is an inaccurate statement of the law. Indeed, he argues only that

9

it is an oversimplification of the law, which coupled with the
prosecutor's argument defendant "could not *as a matter of law* [rely]

10

on imperfect self-defense because he assaulted his father," became a
legally invalid theory of guilt.

11

12

We agree with defendant that a person is precluded from relying on
imperfect self-defense if he or she " 'created circumstances' under
which the 'attack' *as mistakenly perceived by the defendant* had been

13

'*legally justified*.' " In other words, a defendant may be able to rely
on an imperfect self-defense theory if the jury believed that, after

14

committing a simple assault against a civilian victim, a defendant
believed a deputy was going to imminently murder him or her when

15

coming to the civilian victim's aid. (See *People v. Vasquez* (2006)
136 Cal.App.4th 1176, 1179-1180 ["the defense is available when

16

the victim's use of force against the defendant is unlawful, even
when the defendant set in motion the chain of events that led the

17

victim to attack the defendant"].) The instructions as given, however,
said this.

18

19

The jury was instructed that "[i]mperfect self-defense does not apply
when the defendant, through his own wrongful conduct, has created
circumstances that *justify* his adversary's use of force." (Italics

20

added.) A mere assault does not justify an adversary's use of deadly
force. Indeed, as part of the self-defense instruction, the jury was told

21

a justified use of force is the "amount of force that a reasonable
person would believe is necessary in the same situation." Read

22

together, the jury was told imperfect self-defense was not available
when defendant created the circumstances in which his adversary

23

was perceived to use an "amount of force that a reasonable person
would believe is necessary in the same situation." Conversely, if the

24

adversary was perceived to use an amount of force a reasonable
person would believe is unnecessary in the same situation, then

25

defendant could rely on imperfect self-defense. Accordingly, the trial
court adequately instructed on the law. We assume the jury read,

26

understood, and followed these instructions. (*People v. Lucas* (2014)
60 Cal.4th 153, 321.) Moreover, the jury was instructed it had to

27

follow the law as it was explained in the instructions and that the
instructional language controlled over counsel's argument. Thus,

28

while the prosecution implied to the jury defendant was precluded

21

1    from relying on imperfect self-defense under any circumstances, the
     jury was required to reject the argument to the extent it conflicted
2    with the instructions before it.[4]

3    [N.4 Defendant does not challenge the prosecutor's argument on
     other grounds or the court's overruling of trial counsel's objections
4    to those arguments.]

5    To the extent defendant argues the court should have included the
     definition of justified use of force with the imperfect self-defense
6    instruction, that argument is forfeited. The trial court adequately
     instructed on the law, thus any alteration to the instructions could
7    have been addressed with an amplifying or clarifying instruction.
     Because defendant did not request one here, his appellate argument
8    the court erred by instructing the way it did is forfeited.

9                                   **D**

10       ***The Court Adequately Instructed On The Meaning Of A Delusion***

11   Defendant contends the court erred by failing to define a delusion
     when it instructed the jury pursuant to *People v. Elmore* (2014) 59
12   Cal.4th 121, that "[a] person who kills or attempts to kill while acting
     under a delusion cannot avail himself of imperfect self-defense."
13   According to defendant, *Elmore* defined a delusion for the purposes
     of this legal proposition as " 'entirely delusional beliefs,' 'purely
14   delusional beliefs,' and 'psychotic delusions' without 'an objective
     correlate.' " He argues the court's failure to instruct the jury on this
15   definition resulted in the jury applying the wrong legal standard,
     especially given some of defendant's fears were based on the realistic
16   circumstances of his history with the Modoc County Sheriff's
     Department.
17
     The problem with defendant's argument is that the only definition of
18   a delusion provided to the jury, which was presented through
     defendant's expert during testimony, was a fixed false belief marked
19   by a break with reality. This nonlegal definition of a delusion is the
     same as our Supreme Court's definition in *Elmore*. (See *People v.*
20   *Elmore*, *supra*, 59 Cal.4th at pp. 136-137 ["unreasonable self-
     defense, as a form of mistake of fact, has no application when the
21   defendant's actions are entirely delusional.... The line between mere
     misperception and delusion is drawn at the absence of an objective
22   correlate].) Both require false beliefs removed from reality or
     objectivity. Given the only definition of a delusion supplied to the
23   jury was the definition announced in *Elmore*, the trial court
     adequately instructed the jury when it referred to a delusion, without
24   clarification, as prohibiting reliance on imperfect self-defense. Thus,
     any clarification or amplification of the definition of a delusion
25   needed to be requested. Failure to do so resulted in forfeiture of the
     argument.
26
     Breiner, 2020 WL 6018522, at *8–10.
27
     ////
28

                                      22

1    **B.  Discussion**

2         Federal habeas relief is only available if "'the ailing instruction by itself so infected the

3    entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting

4    Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Gilmore v. Taylor, 508 U.S. 333, 342

5    (1993) ("Outside of the capital context, we have never said that the possibility of a jury

6    misapplying state law gives rise to federal constitutional error. To the contrary, we have held that

7    instructions that contain errors of state law may not form the basis for federal habeas relief.") The

8    instruction cannot merely be "undesirable, erroneous, or even 'universally condemned.'"

9    Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). It must violate a constitutional right. Id.

10   The jury instruction "'may not be judged in artificial isolation,' but must be considered in the

11   context of instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414

12   U.S. at 147). The Supreme Court has cautioned that there are few infractions that violate

13   fundamental fairness. Id. at 72-73; see, e.g., Waddington v. Sarausad, 555 U.S. 179, 191–92

14   (2009); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam) ("Nonetheless, not every

15   ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

16   violation"); Gilmore, 508 U.S. at 344.

17        Petitioner's burden is "especially heavy" because he does not claim that the self-defense

18   instruction was erroneous. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Instead, petitioner

19   argues that the self-defense instruction oversimplified an aggressor's ability to rely on imperfect

20   self-defense and failed to define "delusion." The state court rejected these arguments, concluding

21   that the trial court properly instructed the jury on imperfect self-defense. As to the applicability of

22   the defense when defendant is the aggressor, the state court stated that the jury was adequately

23   instructed that "imperfect self-defense was not available when defendant created the

24   circumstances in which his adversary was perceived to use an 'amount of force that a reasonable

25   person would believe is necessary in the same situation.'" Breiner, 2020 WL 6018522, at *9.

26   Regarding the failure to define delusion, the state court determined that "[g]iven the only

27   definition of a delusion supplied to the jury was the definition announced in *Elmore*, the trial

28   court adequately instructed the jury when it referred to a delusion, without clarification, as

1    prohibiting reliance on imperfect self-defense." Id. at *10.

2           In the context of all the instructions, this Court finds that the state court's denial of

3    petitioner's claims was not unreasonable. Jurors are presumed to follow the jury instructions.

4    Weeks v. Angelone, 528 U.S. 225, 234 (2000). The trial court did not have an obligation to give a

5    clarifying or pinpoint instruction absent a specific request by the defendant. Petitioner did not

6    object to the imperfect self-defense instruction, nor did he request an instruction to define

7    "delusion." Kibbe, 431 U.S. at 154 ("It is the rare case in which an improper instruction will

8    justify reversal of a criminal conviction when no objection has been made in the trial court."); see

9    also Gongora v. Stewart, 172 F. App'x 190, 191 (9th Cir. 2006); Villafuerte v. Stewart, 111 F.3d

10   616, 624 (9th Cir. 1997). Because the trial court's instructions were not erroneous and petitioner

11   failed to demonstrate that the omitted instruction was fundamentally unfair or prevented him from

12   presenting an adequate defense, this Court concludes that that state court's decision was not an

13   unreasonable application of clearly established federal law.

14          Even if trial court erred by failing to provide additional instructions on imperfect self-

15   defense, that error did not have a substantial or injurious effect on the verdict. Brecht v.

16   Abrahamson, 507 U.S. 619, 637 (1993). The imperfect self-defense instruction was proper under

17   state law. The state court noted that petitioner's proposed definition of delusion was the only

18   definition of delusion provided to the jury through petitioner's expert's testimony. Breiner, 2020

19   WL 6018522, at *10. Petitioner has not provided any evidence that the jury would have credited

20   his imperfect self-defense without the claimed errors.  This Court recommends denying habeas

21   relief.

22   **III.    Claim Four: Cumulative Error**

23          Lastly, petitioner argues that the combined failure to hold a competency hearing and

24   instructional errors cumulatively deprived him of a right to due process. (ECF Nos. 1 & 6.)

25   Respondent contends that petitioner has not shown that the state court's decision violated any

26   clearly established federal law. (ECF No. 19 at 29-31.)

27   ////

28   ////

**A. State Court Opinion**

On direct appeal, the state court evaluated and denied the claim.

> Defendant argues cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we concluded no error occurred, there was no error to cumulate.

Breiner, 2020 WL 6018522, at *10.

**B. Discussion**

The Ninth Circuit has concluded that under clearly established Supreme Court precedent "the combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair" and "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly, 416 U.S. at 643 and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." Id. at 928 (internal citations omitted).

This Court has addressed each of petitioner's claimed errors, concluding that none of them arise to errors of constitutional magnitude. It now determines that the alleged errors did not make petitioner's defense "far less persuasive" or have a "substantial and injurious effect or influence on the jury's verdict." As a result, this Court recommends denying petitioner's request for habeas relief on his cumulative error claim.

## CONCLUSION

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts.

////

1    THEREFORE, it is RECOMMENDED that petitioner's petition for a writ of habeas

2    corpus (ECF No. 6) be denied.

3    These findings and recommendations will be submitted to the United States District Judge

4    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days

5    after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties. The document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

8    shall be served on all parties and filed with the court within seven (7) days after service of the

9    objections. Failure to file objections within the specified time may waive the right to appeal the

10   District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951

11   F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of

12   appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11,

13   Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability

14   when it enters a final order adverse to the applicant).

15   Dated:  June 21, 2023

16

17   _____

18   DEBORAH BARNES
     UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28